William S. Shea, J.
This is a motion to suppress a film. During the hearing the court viewed the film seized hy the officer and heard the officer’s testimony. Both defendants chose not to testify at the hearing.
*435 The defendants are each charged with the violation of section 235.05 of the Penal Law in that knowing its content and character, they promoted and possessed with intent to promote, a certain obscene film.
The court determines the facts to be that the officer on July 27, 1972 entered the premises, 33 Park Bow, New York City, a book store and peep show establishment. The officer had conversations with the defendants concerning the merchandise for sale and one of the defendants gave the officer change to view the film in a peep show machine. The officer viewed the film, left the store, and returned the next day. On this day, upon entering, the officer noted that the front of the store, to a depth of about 50 feet, was used for selling books and movies. The rear of the store, about another 50 feet in depth held 20 peep show machines," each standing about six feet tall with an opening, at eye level, measuring six inches in width and two inches in height, used for viewing films. The machines are designed for one person viewing at a time. Two people could watch the film together, but they would have to stand quite close together. The officer inserted a quarter in the machine which allowed him to view the film for about two minutes. At the end of thqt time, the film would black out and to continue viewing, another quarter would have to be inserted. Upon doing so, the machine would go on again and the film would continue. Upon the officer’s continuous insertion of quarters the film came to the point where it started and continued to repeat the entire film. The viewing of the entire film by the officer took about 16 minutes.
The officer testified that the film in the machine could not be purchased although other similar pictures and films could be purchased. The officer asked the defendants if they had the keys to the machine. The keys were produced by the defendants and the machine was opened by them. The officer seized the film and vouchered it in police Property Clerk’s office.. The film was produced for viewing at the hearing on this motion. It was viewed by the court, the defendants and their attorney and the District Attorney.
The film depicts two males and a, female engaging in various sexual activity. The film is silent. It bears no title, no musical báckground, no cast of characters and no production credits. In fact there is not one letter of printing on it. In effect it is, in itself, in no way identifiable. Even though it is in form a film, it is actually nothing more than a series of different poses taken by two men and a woman.
*436 On this motion the court is not determining whether or not the film is obscene and there is no claim that section 235.05 of the Penal Law is unconstitutional. The only issue is the legality of the seizure.
The People first contend that the defendants do not have standing to make this motion to suppress. They argue that since the defendants do not allege a proprietary interest in the store or the film, they are not “ persons aggrieved ” and thus their constitutional rights were not violated by the seizure. In this case, the defendants have standing because there was a search and seizure in a premises in which they were present and the evidence seized is to be used against them. (Jones v. United States, 362 U. S. 257; CPL 710.20; People v. Feliciano, 70 Misc 2d 83; People v. Chavez, N. Y. L. J., Aug. 4, 1972, p. 9, col. 6; People v. Stojek, 29 N Y 2d 798, revg. 34 A D 2d 205 on dissenting opn. therein.)
The People further contend that under the circumstances of this case, the seizure by the officer was valid because there was no other way to have the evidence — the film — produced before the court so that it may be used as evidence in the prosecution of the case against the defendants. On this point, the defendants contend that the film should be suppressed because it is protected by the First and Fourteenth Amendments and therefore there should have been an adversary hearing on the question of obscenity prior to its seizure.
Our highest courts have consistently pointed out that special considerations exist in the area of search and seizure when freedom of speech and press are involved. (Roth v. United States, 354 U. S. 476; A Quantity of Books v. Kansas, 378 U. S. 205.) Recognizing that while obscenity is not protected by the First Amendment (Both, supra), any procedure which permits the seizure and impounding of books or other materials protected by the First Amendment must have adequate safeguards against the suppression of nonobscene materials (Kansas, supra; Marcus v. Search Warrant, 367 U. S. 717).- Motion pictures are protected by the First Amendment (Joseph Burstyn, Inc. v. Wilson, 343 U.S. 495).
In Marcus, the court found that a vague search warrant, issued ex parte, left too broad a discretion in the police officers who executed the warrant and which resulted in the seizure of 11,000 copies of 280 different publications. The warrant, in effect, permitted the officers to seize anything they considered obscene.
In Kansas, the police seized all copies (1715 books) of a certain class of publications pursuant to a warrant, issued ex parte *437 by a Judge who read several samples. The court held that such a procedure, without an adversary hearing, on the question of obscenity, did not sufficiently safeguard against the right of the public in a free society to the unobstructed circulation of nonobseene books.
The seizure in Marcus and Kansas involved a “ massive ” amount of books which may reach a substantial audience and therefore the question of what is or is not obscene should not have been left to the discretion of the police officers. Where a “ massive ” seizure is involved, due process requires a prior adversary hearing on the question of obscenity.
The argument has been made that the need for an adversary hearing is not necessary where there is a seizure of a single motion picture (Lee Art Theatre v. Virginia, 392 U. S. 636) since the seizure of one film is analogous to the seizure of one book and thus is not a ‘ ‘ massive seizure. ’ ’ But the weight of authority in the Federal courts is otherwise. (See Bethview Amusement Corp. v. Cahn, 416 F. 2d 410; Astro Cinema Corp. v. Mackell, 422 F. 2d 293; Metzger v. Pearcy, 393 F. 2d 202; Tyrone Inc. v. Wilkinson, 410 F. 2d 639.) “ The restraint involved in seizing a single copy of a book is exceedingly small * * * A film, however, is not directed to a single purchaser; it is aimed at all those who would be in the audience on the days that the film is scheduled to be shown.” (Astro, supra, p. 295).
In Bethview and Astro, the theatre had a potential audience of 4,000 persons per week. Preventing this number of persons from viewing a film is certainly equivalent to seizing all copies of the books involved in Kansas. Such a restraint is substantial and would require an adversary hearing prior to seizure.
Our Court of Appeals, in People v. Heller (29 N Y 2d 319), rejected the Federal cases requirement of a prior adversary hearing contending that where a Judge views a film, finds probable cause that it is obscene and then authorizes a warrant for its seizure, such a procedure satisfies constitutional standards for the protection of First Amendment rights. The Heller court contended that Astro and Bethview go beyond the requirements of the Supreme Court as enunciated in Marcus (the Supreme Court has granted certiorari in the Heller case, but decision is still pending).
While there is a conflict as to the- extent of the prior judicial scrutiny — by adversary hearing or judicial viewing of the items in issue — there is no conflict over the fact that there must be some judicial scrutiny before an allegedly obscene material can be seized. What is clear is that the police themselves cannot *438 determine what is obscene in a massive seizure (Cambist Films v. Duggan, 420 F. 2d 687).
H Thus, as strange as it seems, although the police may seize and/or arrest a person for violating the obscenity statute, they may not seize the allegedly obscene materials unless there was some sort of prior judicial scrutiny.
The People, in this case, claim that if this film could not be seized by the officer, it would not be available as evidence against the defendants at a trial. Thus the People are left with no means of enforcing its obscenity statutes, which they have a right and duty to do (People v. Richmond County News, 9 N Y 2d 578; Kingsley Books v. Brown, 354 U. S. 436; Alberts v. California, 354 U. S. 476).
This situation gives rise to a dilemma between the First Amendment right to show and view a film — the exercise of free speech — as against the People’s rights to enforce its constitutional laws in the field of. obscenity — the aim to punish those who abuse free speech. This dilemma has been considered in the past in the Federal courts by suggesting various remedies available to the People. See Astro Cinema Corp. v. Mackell (422 F. 2d 293, 296-97 [2d Cir.]'). “ While the weight of logic and authority clearly direct us to order return of the •film to those from whom it was seized, the State argues that to do so would be to deprive it of the opportunity to introduce the film in evidence, for the plaintiffs may now destroy the film, •remove it from the jurisdiction, or edit those portions deemed 'obscene by the State. Without issuing an advisory opinion on what remedies the State may pursue to avoid this dilemma, we note only that prior opinions have suggested several possibilities, leaving their resolution .for an actual controversy [emphaisis added]. In Bethview we mentioned an er parte restraining order or a subpoena duce't tecum; Metzger and Tyrone permitted an order allowing. j;he State to demand a copy of the film to aid in the preparation‘and trial of its case. With these alternatives available the State’s claim that we have left it with no means to enforce its obscenity statutes is barren. Indeed, should it be determined that these procedures are. proper, they might provide a reasonable and non-burdensome reconciliation of the interest in allowing the exercise of free speech with the aim of punishing those who abuse it.”
The State’s argument in Astro is basically the same as the People’s contention here. The State argues, in Astro, that the film may be destroyed, removed from the jurisdiction or edited by removal of the obscene portions. In this case, the People *439 argue that the film cannot he produced as evidence for the trial because, unless it is seized, there is no way to identify it as the film the officer viewed. Fundamentally, the claims are the same. The common question is: How will the film be produced in court for use as evidence on the trial?
The remedies stated in Astro and the cases cited therein may be proper where a film is identifiable but are unavailable and inadequate to the case at bar because of the nature of the peep show film — that is that the peep show film is not identifiable. There is no way for a court to identify the film so as to make it the object of a subpoena duces tecum or an ex parte restraining order or a demand that it be made available to the People for trial preparation. These procedures may be applicable where a film has a title or .a named cast or any other mark of identity, but when dealing with a film which can only be described by stating it is an approximately 16-minute film of two men and one woman engaging in sexual activity, such procedures do not provide a reasonable and nonburdensome apparatus for getting the film into court. It is quite apparent that if this film were not seized by the officer, there would be no way to produce it at trial. If the officer, after viewing the film, sought to get a search warrant under Heller the unidentifiable nature of the film is such that any warrant issued would of necessity be void for vagueness as a general warrant in that the thing to be seized could not be specified. (Stanford v. Texas, 379 U. S. 476; People v. Matherson, 16 N Y 2d 509; Marron v. United States, 275 U. S. 192.) The officer could not purchase the film, it was not for sale. Thus, it could not even be presented to a court for judicial scrutiny or an adversary hearing.
The defendants argue that the court, after being informed by , the officer of the film’s content, should have gone to the store to view the film and then issue a warrant. This court does not agree that that is a reasonable task for a Judge. It puts him in the category of an aid of the police and the District Attorney’s office. The duties of a Judge are sufficiently exercised when he reads a copy of a book or views a film in the courtroom or his chambers. To require a Judge to leave the bench, go to a peep show establishment to view a peep show film before it may be used as evidence is unreasonable and outrageous.
Thus, in considering qll aspects of this case, the only way that this particular film could have been legally produced before the . court as evidence was by the seizure of it by the officer after he personally viqwed it.
*440 Also, the seizure in this case is not the seizure of a film in the 'traditional sense. It was not shown to a large public audience in— a theatre. It was shown in the rear of a book store-peep show establishment, viewable by one person at a time. The viewing stops every two minutes unless fed additional quarters. There are 19 other machines in the same store and defendants gave us no idea of how many people might view this particular film in the course of .a day. Whatever the number it is not so large a public audience who would be deprived of seeing a possibly nonobseene film as was contemplated in Marcus.
Furthermore, the seizure in this case is not confiscatory. If the film is not determined to be obscene after trial, it will b® returned.
In Rage Books v. Leary (301 F. Supp. 546 [1969]), the court held that the arrest of a defendant suspected of holding obscene material for commercial promotion and seizure of six specimens of the publication was not tantamount to prior restraint in violation of the free speech clause, but was reasonable and proper for evidentiary purposes. In that case the court said (pp. 548-549): '
“ The Supreme Court has held that confiscatory seizure of substantial quantities of books or other matter is not permissible unless preceded by an adversary judicial determination of the obscenity of the material. A Quantity of Books v. Kansas, 378 U. S. 205 * * * See, United States v. Brown, 274 F. Supp. 561 (S. D. N. Y. 1967).
“An-arrest and an accompanying seizure of specimens only of the allegedly obscene materials are another matter entirely. No decision has thus far prohibited the normal police function of effecting an arrest and the seizure of sample evidence of a suspected crime being committed. Such an arrest and a limited supporting seizure are not tantamount to a prior restraint since the jeopardy faced is essentially the restraint of obscenity law itself in respect of the remainder of the wares on the shelves and self-censorship in respect thereof at the option of the merchant. It has never been held that liberty of speech is absolute. Times Film Corp. v. City of Chicago, 365 U. S. 43 * * * (1961). The protection even as to previous restraint is not absolutely unlimited. Near v. Minnesota, 283 U. S. 697 * * * (1931).”
In furtherance of the holding in Rage (supra), the facts in the case at bar add further reason for the seizure of the film. It was not for sale and it was not identifiable. The seizure was therefore legal.
*441 The People further contend that while a police officer may not make his own determination of what is or is not obscene, there is a difference between a determination of what is obscene and what is hard-core pornography. That where hard-córe pornography is involved, a police officer is capable of determining whether there is probable cause to believe the material violates section 235.05 of the Penal Law and thus seize the material as incident to a lawful arrest.
The court recognizes that there is difficulty in determining obscenity from works of art, literature or magazines, or motion pictures that deal with sex. Sex and obscenity are not synonymous (Roth v. United States, 354 U. S. 476). The making of such a determination requires sensitive tools because the line between obscene and nonobscene materials is at times finely drawn. But it is sometimes plainly obvious, as in photographs or films depicting males and females engaging in oral sodomy, anal sodomy, and/or eunnilingus. This is especially true when we are dealing with films — particularly short, silent films with no plots. On the issue of probable cause the visual impact of p film as distinguished from other media cannot be disregarded. The technological features of films make the ideas presented more comprehensible than is the case in any other medium except television (Freedman v. Maryland, 380 U. S. 51; Landau v. Fording, 245 Cal. App. 2d 820, affd. 388 U. S. 456). Film assures a high degree of attention and retention.
Did the officer have probable cause to believe this film was hard-core pornography? Justice Stewart has described hardcore pornography as material “with no pretense of artistic value, graphically depicting acts of sexual intercourse, including various acts of sodomy and sadism, and sometimes involving •several participants in scenes of orgy-like character.” (Ginzburg v. United States, 383 U. S. 463, 499, n. 3.) Hard-core pornography focuses predominantly upon what is ‘ ‘ sexually morbid, grossly perverse and bizarre * * * depicting dirt for dirt’s sake, the obscene is the vile, rather than the coarse, the blow to sense, not merely to sensibility. It smacks, at times, of fantasy and unreality, of sexual perversion and sickness ” (People v. Richmond County News, 9 N Y 2d 578, 587). Hard-core pornography has as its primary aim “ to shock, revolt, or embarrass by explicitly depicting sexual intimacies — especially those' of a loveless, perverse or brutal kind — and other works that horrify with vivid details of nonsexual brutality” (People v. Kirkpatrick, 64 Misc 2d 1055, 1080, affd. 69 Misc 2d 212, citing Dr.,Benjamin Spock, Decent and Indecent, p. 87 [1969]). Hard *442 core pornography is patently offensive and its indecency speaks for itself (Memoirs v. Massachusetts 383 U. S. 413, 457).
Just as obscenity is not synonymous with sex or nudity, tile courts have long recognized that hard-core pornography is not synonymous with obscenity (People v. Richmond County News, supra). Hard-core pornography is a specific type of obscenity, it is obscenity in its easiest recognizable form. It contains “ something more ” than obscenity in its general or hard to recr ognize form and that “ something ” is its depiction of actuql sexual activity including intercourse and deviate acts (People v. G. I. Distrs., 20 N Y 2d 104, cert. den. 389 U. S. 905; Redrup v. New York, 386 U. S. 767). See, also, United States v. Klaw (350 F. 2d 155 [2d Cir., 1965]); Womack v. United States (294 F. 2d 204, 206, cert. den. 365 U. S. 859); People v. Kirkpatrick (supra), where the courts held that hard-core pornography is more readily definable and recognizable and thus no expert testimony is required since it is legally condemnable as if res ipsa loquitur.
Section 130.00 of the Penal Law defines deviate sexual intercourse as sexual conduct consisting of contact between the penis and the anus, the mouth and the penis or the mouth and the vulva. Such acts also constitute hard-core pornography and are not constitutionally protected (Roth, supra; Womack v. United States, supra). Surely if the officer viewed these acts live, he would have probable cause to arrest the defendants and the participants (People v. Bercowits, 61 Misc 2d 974). Such acts on film do not lessen their nature.
The court has viewed the film and agrees that the officer had probable cause to believe he was viewing hard-core pornography and that he could then seize it as incident to a lawful arrest (People v. Morgan, 68 Misc 2d 667; United States v. Fragus, 428 F. 2d 1211).
Accordingly the court finds that the seizure was not in violation of defendants’ constitutional rights and the defendants have failed to carry their burden on the motion to show that it did, and denies the motion to suppress. The film is admissible against them on the trial.